**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| CROSSOVER MARKET LLC, TRILOGY, INC., TRILOGY ENTERPRISES, INC., AND AUREA SOFTWARE, INC., | )<br>)<br>)<br>) |
| Plaintiffs, | ) Case No. 1:21-cv-640-JRN |
| v. | )<br>)<br>) |
| STEPHANIE NEWELL, | )<br>) |
| Defendant. | )<br>)<br>) |

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ........................................................................................................... 1
II. BACKGROUND .............................................................................................................. 1
III. LEGAL STANDARD ...................................................................................................... 3
IV. ARGUMENT ................................................................................................................... 3
    a. Crossover Will Likely Succeed on Its Breach-of-Contract Claims ....................... 3
        i. The Agreement Between Crossover and Newell is Valid and Enforceable. ................................................................................................. 4
        ii. Crossover Performed as Required by the Agreement. ............................... 6
        iii. Newell Breached the Agreement. .............................................................. 6
        iv. Crossover Has Sustained Damages as a Result of the Breach .................. 8
    b. Crossover Has Suffered and Will Continue to Suffer Imminent and Irreparable Harm in the Absence of Injunctive Relief. ......................................... 8
        i. Without a Preliminary Injunction the Harm to Crossover is Imminent .................................................................................................... 8
        ii. Without a Preliminary Injunction, Crossover Will Suffer Irreparable Harm from Newell's Disclosure of Confidential Information. ................................................................................................ 9
        iii. A Preliminary Injunction Is Necessary to Maintain the Status Quo. ....... 10
    c. The Balance of Hardships Militate in Favor of a Preliminary Injunction ........... 11
    d. A Preliminary Injunction Would Not Harm but Instead Would Promote the Public Interest. ............................................................................................... 11
V. CONCLUSION ............................................................................................................... 12

## **TABLE OF AUTHORITIES**

**Page**

**CASES**

*AHS Staffing, LLC v. Quest Staffing Grp., Inc.*,
    335 F. Supp. 3d 856 (E.D. Tex. 2018) .................................................................................... 9

*Barnett v. Network Sols., Inc.*,
    38 S.W.3d 200, 203–04 (Tex. App.—Eastland 2001) ..................................................... 4

*Davis v. Chaparro*,
    431 S.W.3d 717 (Tex. App.—El Paso 2014) ................................................................. 5

*Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*,
    441 F.2d 560 (5th Cir. 1971) .......................................................................................... 11

*FMC Corp. v. Varco Int'l, Inc.*,
    677 F.2d 500 (5th Cir. 1982) .......................................................................................... 3

*Heil Trailer Int'l Co. v. Kula*,
    542 F. App'x 329 (5th Cir. 2013) .................................................................................. 10

*Hollon v. Mathis Indep. Sch. Dist.*,
    491 F.2d 92 (5th Cir. 1974) ............................................................................................ 3

*Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of G*,
    829 F.3d 719 (5th Cir. 2018) .......................................................................................... 4

*Janvey v. Alguire*,
    647 F.3d 585 (5th Cir. 2011) ..................................................................................... 3, 11

*Learn2.com, Inc. v. Bell*,
    No. 3:00-CV-812-R, 2000 WL 36731362 (N.D. Tex. July 20, 2000) ........................... 12

*McCoy v. Alden Indus., Inc.*,
    469 S.W.3d 716 (Tex. App.—Fort Worth 2015 ............................................................. 4

*Med. Servs., Inc. v. Health Care Serv. Corp.*,
    614 F. App'x 731 (5th Cir. 2015) .................................................................................. 4

*Mid-Continent Cas. Co. v. Global Enercom Mgmt., Inc.*,
    323 S.W.3d 151 (Tex. 2010) .......................................................................................... 6

*Pfeiffer v. Ajamie PLLC*,
    469 F. Supp. 3d 752 (S.D. Tex. 2019) ......................................................................... 10

*Phillips v. Carlton Energy Group, LLC*,
    475 S.W.3d 265 (Tex. 2015) .......................................................................................... 5

*Picker Int'l, Inc. v. Blanton*,
    756 F. Supp. 971 (N.D. Tex. 1990) ............................................................................. 3

*Rassoli v. Intuit Inc.*,
    No. CIV.A. H-11-2827, 2012 WL 949400 (S.D. Tex. Mar. 19, 2012) ............................ 4

*Realogy Holdings Corp. v. Jongebloed*,
    957 F.3d 523 (5th Cir. 2020) ........................................................................................ 4

*RealPage, Inc. v. EPS, Inc.*,
    560 F. Supp. 2d 539 (E.D. Tex. 2007) .......................................................................... 4

*Serna v. Texas DSHS*,
    No. 1-15-cv-446, 2015 WL 10818655 (W.D. Tex. Oct. 16, 2015) ............................... 11

*Siff v. State Democratic Exec. Comm.*,
    500 F.2d 1307 (5th Cir. 1974) ...................................................................................... 3

*State of Texas v. Seatrain Int'l, S. A.*,
    518 F.2d 175 (5th Cir. 1975) ........................................................................................ 3

## **OTHER AUTHORITIES**

*Clickwrap Agreement*,
    BLACK'S LAW DICTIONARY (11th ed. 2019) .................................................................. 5

*Point-and-Click Agreement*,
    BLACK'S LAW DICTIONARY (11th ed. 2019) .................................................................. 5

Plaintiffs Crossover Market LLC, Trilogy, Inc., Trilogy Enterprises, Inc., and Aurea Software, Inc. (together "Crossover" or "Plaintiffs") move for a preliminary injunction enjoining Defendant Stephanie Newell ("Newell") from disclosing Crossover's confidential information any further, turning over Crossover's confidential information in her possession, and deleting all copies of Crossover's confidential information in her possession.

## I.   INTRODUCTION

This lawsuit arises out of the unlawful misappropriation of Crossover's confidential information by its former independent contractor, Stephanie Newell, who disclosed information to a *Forbes* reporter in order to inflict damage on Crossover and at least three of its affiliated entities. Newell's reluctance to agree to an injunction to protect Crossover's protected information, which should never have been disclosed in the first place, is alarming and underscores the need for a preliminary injunction in this case. A preliminary injunction would only ensure that Newell honors her independent contractor agreement going forward and protects Crossover's sensitive information.

## II.   BACKGROUND

In June 2020, Crossover and Stephanie Newell entered into a contract that facilitated the business relationship between the parties entitled the "Independent Contractor Services Agreement" (hereinafter "Independent Contractor Services Agreement" or "Agreement"). Javed Decl., at ¶ 14; *see also* Ex. A.[1] In the Agreement, Newell made a series of promises including: (1) to keep all business and software information of Crossover and its affiliates confidential (Ex. A ¶ 4.1); (2) to "protect and safeguard the Confidential Information at all times and not to

---

[1] Citations to Exhibit A are the correct and exact language from the clickwrap agreement Newell executed as attested by Valeria Cavaliere. Cavaliere Decl., at ¶ 5.

1

disclose, give, transmit or otherwise convey any Confidential Information, in whole or in part, to any other party," (Ex. A ¶ 4.2); (3) not to "use any Confidential Information for [her] own purpose or for the benefit of any third party and [] honor the copyrights and other intellectual property rights of [the] Company and [] not copy, duplicate, or in any manner reproduce any such copyrighted materials," (Ex. A ¶ 4.3); and (4) to "comply at all times with the applicable rules, regulations, and applicable internal policies regarding security when using Company hardware, software, network devices, e-mail accounts or data owned or managed by Crossover or its affiliates," (Ex. A ¶¶ 6.2, 6.4). "Confidential Information include[d] all information and materials disclosed orally or in any other form, regarding . . . [Crossover's] software products or software product development including . . . configuration techniques, data classification techniques, user interface, applications programming interfaces, data modeling and management techniques, data structures, and other information relating to [Crossover's] or its Customer's software products or derived from testing or other use." Ex. A ¶ 4.1.

In an effort to damage Crossover, Newell breached the Independent Contractor Services Agreement by improperly and unlawfully disclosing Crossover's confidential and proprietary information to Nathan Vardi, a Senior Editor at *Forbes* Media. Vardi accessed Newell's computer and read through Crossover's confidential information including Trilogy Enterprises' internal "new playbook," internal email communications sent by the founder of ESW Capital, confidential salary and staffing information related to Crossover, and "internal text messages" and internal messages shared between Crossover representatives and contractors. Javed Decl., at ¶ 19. On April 27, 2021, Vardi published an article containing the information that Newell shared with him. *See* Ex. B. Tellingly, she does not deny these allegations in her Motion to Dismiss; rather Newell focuses on the non-existence of a contract. *See* ECF No. 11.

Upon learning of the nefarious transfer of information, Crossover initiated this lawsuit and now seeks preliminary relief to halt further exploitation of Crossover's confidential information.

### III. LEGAL STANDARD

An injunction is a proper remedy where an employee has breached, or is in such a position that it is likely that he or she will breach, a confidentiality agreement. *Picker Int'l, Inc. v. Blanton*, 756 F. Supp. 971, 981 (N.D. Tex. 1990) (citing *FMC Corp. v. Varco Int'l, Inc.,* 677 F.2d 500 (5th Cir. 1982)). "The purpose of a preliminary injunction is to preserve the status quo during litigation to determine the merits of the case for permanent injunction." *Hollon v. Mathis Indep. Sch. Dist.*, 491 F.2d 92, 93 (5th Cir. 1974). To obtain a preliminary injunction, a movant must show "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011) (citation omitted). Each of these four elements must be met, but "none of the four prerequisites has a fixed quantitative value." *State of Texas v. Seatrain Int'l, S. A.*, 518 F.2d 175, 180 (5th Cir. 1975). "Rather, a sliding scale is utilized, which takes into account the intensity of each in a given calculus." *Id.* (citing *Siff v. State Democratic Exec. Comm.*, 500 F.2d 1307, 1309 (5th Cir. 1974)). In this case, each of these factors weighs heavily in favor of issuing a preliminary injunction.

### IV. ARGUMENT

#### a. Crossover Will Likely Succeed on Its Breach-of-Contract Claims.

Crossover has a strong likelihood of prevailing on the merits of its breach-of-contract claim against Newell. To state a breach-of-contract claim under Texas law, the plaintiffs must

3

establish: (1) "existence of a valid contract"; (2) "performance or tendered performance by the plaintiff"; (3) "breach of the contract by the defendant"; and (4) "damages sustained as a result of the breach." *Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of G*, 829 F.3d 719, 726 (5th Cir. 2018) (quoting *Med. Servs., Inc. v. Health Care Serv. Corp.*, 614 F. App'x 731, 739 (5th Cir. 2015)). Each of these elements are satisfied here and Ms. Newell's breach poses an irreparable threat to Crossover.

### i. The Agreement Between Crossover and Newell is Valid and Enforceable.

A valid and enforceable contract exists when each of the following elements are met: "(1) an offer, (2) an acceptance in strict compliance with the terms of the offer, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that it be mutual and binding." *McCoy v. Alden Indus., Inc.*, 469 S.W.3d 716, 728 (Tex. App.—Fort Worth 2015).

Under Texas law, a contract need not necessarily be signed to be enforceable. Rather, Texas law recognizes the validity of clickwrap agreements. *See, e.g.*, *Realogy Holdings Corp. v. Jongebloed*, 957 F.3d 523, 532 (5th Cir. 2020) (upholding the district court's finding that a former employee had agreed to various post-employment, noncompetition provisions in a "clickwrap" agreement); *Rassoli v. Intuit Inc.*, No. CIV.A. H-11-2827, 2012 WL 949400, at *2 (S.D. Tex. Mar. 19, 2012); *RealPage, Inc. v. EPS, Inc.*, 560 F. Supp. 2d 539, 545 (E.D. Tex. 2007); *Barnett v. Network Sols., Inc.*, 38 S.W.3d 200, 203–04 (Tex. App.—Eastland 2001) (upholding a forum selection clause in a clickwrap agreement in which users had to scroll through the agreement before clicking their acceptance); *see also Clickwrap Agreement*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("See point-and-click agreement."); *Point-and-Click Agreement*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("An electronic version of a shrinkwrap

license in which a computer user agrees to the terms of an electronically displayed agreement by pointing the cursor to a particular location on the screen and then clicking.").

Because each of these contractual elements is met, the agreement Newell executed is binding. First, in order for Newell to become a Crossover independent contractor, Crossover offered her a position contingent on her accepting the terms in the Independent Contractor Services Agreement. Javed Decl., at ¶ 14. Second, Newell accepted this offer because she agreed to the terms by clickwrap agreement. Cavaliere Decl., at ¶ 5; *see* Ex. C (showing the box Newell had to click in order to accept the terms of employment with Crossover).

Third, there was a meeting of the minds. Courts usually determine if a meeting of the minds occurred only for implied-in-fact contracts, as the issue is seldom litigated over written contracts. But when courts consider this issue, they use an objective standard—one in which the "parties' communications and actions" decide the issue, "not their subjective states of mind." *Davis v. Chaparro*, 431 S.W.3d 717, 723 (Tex. App.—El Paso 2014). Here, the parties objective actions are clear. Newell and Crossover entered into the Independent Contractor Services Agreement as a precondition for Newell to begin working. Cavaliere Decl., at ¶ 4. Thus, there was a meeting of the minds. And consequently, fourth, each party consented to the terms. For Crossover's part, Crossover provided the terms, and for Newell's part, she accepted the terms by clickwrap agreement. *Id.* at ¶ 5

Fifth and finally, the contract was properly executed. Under Texas law, "a contract need not be signed to be 'executed' unless the parties explicitly require signatures as a condition of mutual assent." *Phillips v. Carlton Energy Group, LLC*, 475 S.W.3d 265, 277 (Tex. 2015) (quoting *Mid-Continent Cas. Co. v. Global Enercom Mgmt., Inc.*, 323 S.W.3d 151, 157 (Tex. 2010)). The Independent Contractor Services Agreement did not require signatures. *See*

5

*generally* Ex. C.; Cavaliere Decl., at ¶ 5. Thus, the clickwrap agreement sufficed. As a result, the Independent Contract Services Agreement is valid and enforceable.

### ii. *Crossover Performed as Required by the Agreement.*

Crossover performed its obligations under the Independent Contract Services Agreement. Crossover's primary obligation was "to connect [Newell] with Customers" so that Newell could provide them her services. Javed Decl. at ¶ 12; Ex. A ¶ 9.1. The Agreement established "the terms and conditions under which [Newell would] be staffed to provide certain professional services to the Company's customers." Ex. A at 1 (Preamble); *see also* Cavaliere Decl., at ¶ 5; Javed Decl., at ¶ 11. Crossover agreed to engage Newell—and thus provide "work or service fees"—if a "Job Assignment" were "generated by [a] Customer and accepted by both [Newell and Crossover]." Javed Decl., at ¶ 13; Ex. A ¶ 1.2. The "applicable service fees" were to be described in each "Job Assignment." Ex. A ¶ 1.1. Crossover paid Newell as "scheduled in the frequency indicated in [each] Job Assignment." Javed Decl., at ¶ 11; Ex. A ¶ 3.1

### iii. *Newell Breached the Agreement.*

In her Independent Contractor Services Agreement, Newell made several covenants that she later breached. Specifically, Newell agreed:

- "*to keep confidential all Deliverables and all technical, product, business, financial, and other information regarding the business and software programs* of [Crossover], its Affiliates, customers, employees, investors, contractors, vendors and suppliers (the 'Confidential Information')," which included but was not limited to "programming techniques and methods, research and development, computer programs, documentation, marketing plans, customer identity, and business methods," Ex. A, ¶ 4.1 (emphasis added);

- that "*Confidential Information include[d] all information and materials disclosed orally or in any other form, regarding the Site, [Crossover's] or its Customers' software products or software product development* including, but not limited to, the configuration techniques, data classification techniques, user interface, applications programming interfaces, data modeling and management techniques, data structures, and other information of or relating to [Crossover's]

> or its Customers' software products or derived from testing or other use," Ex. A, ¶ 4.1 (emphasis added);
>
> - "***to protect and safeguard the Confidential Information at all times and not to disclose, give, transmit or otherwise convey any Confidential Information***, in whole or in part, to any other party," Ex. A, ¶ 4.2 (emphasis added);
>
> - not to "***use any Confidential Information for your own purpose or for the benefit of any third party***," and to "honor the copyrights and other intellectual property rights of [Crossover]" and "not copy, duplicate, or in any manner reproduce any such copyrighted materials," Ex. A, ¶ 4.3 (emphasis added);
>
> - that "[t]o the extent [she has] access to or use[s] [Crossover] facilities or Customer facilities, hardware, software, network devices, network services, associated components, e-mail accounts or data owned or managed by [Crossover], Affiliates, or Customers, [Newell would] ***comply at all times with the applicable rules and regulations regarding safety, security, use, and conduct as reasonable (sic) requested by [Crossover], Affiliates or Customers***," Ex. A, ¶ 6.2 (emphasis added); and
>
> - that if "[Crossover] or a Customer provide[d] any computer(s), hardware, software, telephone, or other tools (collectively the 'Loaned Equipment'), the same will continue to be [Crossover's] property and [Newell would] ***use the Company Equipment exclusively to provide the services under this Agreement and in accordance with the applicable internal policies***," Ex. A, ¶ 6.4 (emphasis added).

Newell breached these covenants by improperly and unlawfully disclosing Crossover's, Trilogy's, Trilogy Enterprises', and Aurea's confidential and proprietary information.

The services that Newell rendered for Crossover included acting as a Talent Acquisition Consultant, and in that capacity, she gained access to confidential information about Crossover, Trilogy, Trilogy Enterprises, Aurea, and their affiliates. Javed Decl., at ¶ 11. Newell then proceeded to breach each of the foregoing contractual provisions by transmitting a substantial amount of the above parties' confidential and proprietary information to Nathan Vardi. Javed Decl., at ¶ 19.

### *iv. Crossover Has Sustained Damages as a Result of the Breach.*

In addition to the reputational damage done to Crossover by the *Forbes* headline, the disclosure of Crossover's confidential information has certainly done financial harm as well. Until *Forbes*'s reporting on Crossover's confidential salary and staffing information related to Crossover, that information was unknown to Crossover's competitors. The disclosure, enabled by Newell, provides Crossover's competitors the opportunity to revise their product plans to attempt to build a similar and competing strategy. Further, a competitor or hostile party now has the opportunity to pinpoint weaknesses in Crossover's ideas and exploit them. Crossover has suffered—and will continue to suffer—damages and irreparable harm as a result of Newell's breaches. As a result, Crossover is likely to succeed on the merits of its breach-of-contract claim.

### b. Crossover Has Suffered and Will Continue to Suffer Imminent and Irreparable Harm in the Absence of Injunctive Relief.

Unless an injunction issues, irreparable harm to Crossover will be imminent and cannot be undone by an award of monetary damages. Further, the status quo must be preserved to prevent the situation devolving by Newell further disclosing Crossover's confidential and proprietary information to other unauthorized persons.

### *i. Without a Preliminary Injunction the Harm to Crossover is Imminent.*

Newell's conduct thus far, including her refusal not to disclose further confidential information, turn over all copies of confidential information, and delete all copies of confidential information during the pendency of this litigation, raises imminent concerns that must be addressed with a preliminary injunction. Courts recognize "that enjoining an employee from using an employer's confidential information is appropriate when it is probable that the former employee will use the confidential information for [her] benefit . . . or to the detriment of [her]

8

former employer." *AHS Staffing, LLC v. Quest Staffing Grp., Inc.*, 335 F. Supp. 3d 856, 869 (E.D. Tex. 2018). There is no dispute that Newell has access to and is in possession of confidential information belonging to Crossover including internal email communications sent by the founder of ESW Capital as well as confidential salary and staffing information related to Crossover specifically. Javed Decl., at ¶ 16. Additionally, as uncovered by the *Forbes* article, Newell also has "internal text messages" and internal messages shared between Crossover representatives and contractors in her possession. *Id.;* Javed Decl., at ¶ 20.

The fact that Newell gathered this information and intentionally shared it with a *Forbes* reporter is evidence that Newell intended to harm Crossover. Because Newell has refused thus far to agree not to disclose further confidential information, turn over all copies of confidential information, and delete all copies of confidential information, Crossover has a growing concern that Newell might disclose further proprietary information before the conclusion of this case.

### ii. Without a Preliminary Injunction, Crossover Will Suffer Irreparable Harm from Newell's Disclosure of Confidential Information.

"In any situation placing confidential information at stake, once it is made public, its confidential nature is permanently and irrevocably impaired." *Pfeiffer v. Ajamie PLLC*, 469 F. Supp. 3d 752, 764 (S.D. Tex. 2019). Crossover's unquantifiable risk of loss to potential employees, reputation, and goodwill establishes irreparable harm.

Because of the highly competitive nature for talent in the software space, further disclosure of Crossover's hiring strategies would harm Crossover in seeking personnel either by influence on potential talent through cynical articles in the press or by implementation of the same strategy by competitors. Due to the difficulty in determining the proliferation of news, not only by the number of people who have read the article, but by the dissemination of its contents through word of mouth, it will be difficult to determine, after-the-fact, how Crossover's hiring

9

practices were affected due to further disclosure of Crossover's confidential information. "An irreparable injury is one that cannot be undone by monetary damages or one for which monetary damages would be 'especially difficult to calculate.'" *Heil Trailer Int'l Co. v. Kula*, 542 F. App'x 329, 335 (5th Cir. 2013). The harm that Crossover faces cannot be undone or remedied with monetary damages.

Moreover, Newell's activities threaten to irreversibly harm Crossover's reputation and goodwill within the industry. Because of Newell's apparent objective to tarnish Crossover's reputation, her further disclosure of Crossover's confidential information could lead to further headlines like the one published in *Forbes* that imply Crossover is pioneering turning "workers into algorithms." *See*. Ex. B. This harm is incalculable and cannot be remedied by monetary damages.

### iii. *A Preliminary Injunction Is Necessary to Maintain the Status Quo.*

The overriding purpose of a preliminary injunction is to "preserve the status quo and thus prevent irreparable harm until the respective rights of the parties can be ascertained during a trial on the merits." *Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 441 F.2d 560, 561 (5th Cir. 1971); *see also Serna v. Texas DSHS*, No. 1-15-cv-446, 2015 WL 10818655, at *11 (W.D. Tex. Oct. 16, 2015) (quoting same). Here, the predicament that Crossover faces is that its confidential and proprietary information is not only in Newell's possession, but also in another unauthorized third party's possession. An injunction is necessary to prevent Newell from inflicting further irreparable harm on Crossover by disclosing any more of its confidential information to other unauthorized persons. Indeed, any damages will be significantly compounded if Newell again shares Crossover's documents in her possession. Crossover requires immediate relief to maintain the status quo and deprive Newell of the information she is no longer privy to so that Crossover may adequately protect itself .

### c. The Balance of Hardships Militate in Favor of a Preliminary Injunction.

There can be little doubt in this case that "the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted." *Janvey*, 647 F.3d at 595. The irreparable harm from Newell's exploitation of confidential Crossover documents would be substantial for the reasons discussed above, whereas granting the injunction would result in no comparable harm. If, for the sake of argument, it ultimately turns out that Newell did not breach her contract by sharing Crossover's confidential information with unauthorized third parties, then an injunction requiring her to refrain from using the confidential information and to purge them from her possession would inflict no harm whatsoever on her. If instead Newell is planning to disclose confidential information further, she will ultimately lose on the merits of Crossover's claims and she cannot reasonably object to preliminary relief.

It is worth noting that granting this motion will have minimal—if any—impact on Newell. The requested injunction would not impact her ability to earn a living, her career development, or her life in general. Any claim that an injunction would prevent Newell from her ordinary course of everyday life is meritless and should be rejected. Although a preliminary injunction would not harm Newell in the slightest, the consequences for Crossover if a preliminary injunction is not entered are dire for the reasons stated above. Accordingly, the balance of hardships strongly favors entry of a preliminary injunction.

### d. A Preliminary Injunction Would Not Harm but Instead Would Promote the Public Interest.

Under the final factor, a preliminary injunction would not harm, and would in fact benefit the public interest by requiring former employees to abide by their obligations under valid agreements. *See, e.g.*, *Learn2.com, Inc. v. Bell*, No. 3:00-CV-812-R, 2000 WL 36731362, at *17 (N.D. Tex. July 20, 2000) (noting that public interest is best served by discouraging former

11

employees from "disregarding [agreements] whenever they become inconvenient" and "disserved by permitting persons to breach valid contractual agreements"). The public interest factor thus justifies granting Crossover's request for a preliminary injunction.

## V.     CONCLUSION

For the reasons set forth above, Crossover respectfully asks that the Court issue a preliminary injunction against Newell in accordance with the proposed order.

DATED: December 10, 2021            Respectfully submitted,

                                             QUINN EMANUEL URQUHART & SULLIVAN, LLP

                                             */s/ Scott Cole*

                                             Scott Cole
                                             Texas Bar No. 00790481
                                             scottcole@quinnemanuel.com
                                             Asher Griffin
                                             Texas Bar No. 24036684
                                             ashergriffin@quinnemanuel.com
                                             300 West Sixth Street, Suite 2010
                                             Austin, Texas 78701
                                             (737) 667-6100 Telephone
                                             (737) 667-6110 Fax

                                             *Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that, on December 10, 2021, the foregoing was electronically filed with the Court by using the Western District of Texas' CM/ECF filing system, which provided notice of the filing to all CM/ECF participants.

>   */s/Scott Cole*
>   Scott Cole

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| CROSSOVER MARKET LLC, TRILOGY, INC., TRILOGY ENTERPRISES, INC., AND AUREA SOFTWARE, INC.,<br><br>                Plaintiffs,<br><br>v.<br><br>STEPHANIE NEWELL,<br><br>                Defendant. | )<br>)<br>)<br>)<br>) Case No. 1:21-cv-640-JRN<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**[PROPOSED] ORDER GRANTING
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Before the Court is Plaintiffs Crossover Market LLC, Trilogy, Inc., Trilogy Enterprises, Inc., and Aurea Software, Inc.'s ("Crossover") Motion for Preliminary Injunction. The Court, being duly advised, and finding good cause to grant Plaintiffs' motion, hereby GRANTS Plaintiffs' motion and ORDERS as follows pending resolution of a trial on the merits:

1. Defendant Newell is prohibited from using, disclosing, disseminating, distributing, or discussing Crossover's confidential information;

2. Defendant Newell is directed to return Crossover's confidential information that is in her possession, custody, or control and any information derived, directly or indirectly, from Crossover's confidential information that is in her possession, custody, or control including such information from her databases, records, files, computers, and other media and data storage sources;

2. Defendant Newell is directed to destroy all copies of Crossover's confidential information that are in her possession, custody, or control and any information derived, directly or

1

2

indirectly, from Crossover's confidential information that is in her possession, custody, or control including by purging such information from her databases, records, files, computers, and other media and data storage sources; and

3.      Persons or entities who are in active concert or participation with Defendant Newell's are directed to destroy all copies of Crossover's confidential information in their possession, custody, or control and any information derived, directly or indirectly, from Crossover's confidential information that is in their possession, custody, or control, including by purging such information from any of their databases, records, files, computers, and other media and data storage sources.

Dated: _____, 2021            _____
                                      JAMES R. NOWLIN
                                      UNITED STATES DISTRICT JUDGE

2